Peter E. WYNN, Plaintiff-Respondent,

v.

McMAHON FORD COMPANY, a corporation, Defendant-Appellant.

No. 32519.

St. Louis Court of Appeals.

Missouri.

March 21, 1967.

Melville A. Ochsner, St. Louis, for appellant.

Coleman, Ross & Cekovsky, Jack H. Ross, Sidney B. McClanahan, Clayton, for respondent.

TOWNSEND, Commissioner.

This is an action for damages arising on the breach of an alleged contract for the sale of a boat, a motor and a trailer. Plaintiff prevailed in the Magistrate Court and, on appeal, in the court-tried case in Circuit Court, plaintiff had a judgment for $350. This appeal followed.

Plaintiff testified to the following effect: Having heard from an undesignated person that a boat was for sale at the premises of defendant, he went to defendant's used car lot and there encountered Mr. Walton, used-car salesman, and inquired if they had a boat for sale. Mr. Walton answered in the affirmative and priced the boat at four hundred ninety-five dollars. (All references herein to "boat" are intended to include the motor and trailer). Plaintiff inspected the boat and noted some minor defects; Walton asked if $20 would cover repair of the same. Upon plaintiff's affirmative answer to that question Walton then priced the boat at $475. Plaintiff then left to return the following evening to tell Walton whether he would take the boat. Upon that return he discussed the matter of a sale with Walton and Mr. Staley, used-car sales manager of defendant. As to Staley's participation in this conversation, plaintiff was asked: " * * * did you seek him out or did Woody [Walton] seek him out or—?" Answer: "No, Woody was talking to Mr. Staley. In other words, we were talking together then as three." Plaintiff said that he would take the boat and asked if they would deliver it. Walton answered "No." The price of $475 was mentioned in the conversation with Staley and he knew of plaintiff's inability to then remove the boat owing to the lack of a trailer hitch; he indicated that it was satisfactory to sell the boat to plaintiff for $475. Plaintiff then paid $25 in cash on the price and said that he would return to remove the boat on the second day thereafter after procuring a trailer hitch with which to tow the boat. Staley volunteered that "possibly they could find a hitch that would fit my car that would enable me to take it home."

"Q. And did he suggest a time for you to come back to get the boat?

A. We discussed that, and I had to work Saturday at the Post Office, and after I got off work I told him that I would be out with the check, and I would have a way of taking the boat home possibly, and he said, well, he would try to have a hitch for me.

Q. Mr. Staley, is the person you're referring to?

A. That's right."

On that day plaintiff asked Walton and Staley if they had the title to the boat and if it was clear and in response they stated that "it was clear" and "they told me that the title was in the safe."

When plaintiff paid his $25 he asked for a receipt; Walton looked around for some paper and found only a pad of form contracts for used car sales. On one of such forms he wrote out what plaintiff main-

tains is only a receipt for the sum paid, and gave it to plaintiff stating that it was his receipt. As defendant contends that the instrument so delivered by Walton was an offer to buy the boat we digress here and set out the whole of the relevant parts of the instrument which was later put into evidence as defendant's Exhibit A:

CAR ORDER                                    Date   1–30   1964
DEALER       McMahon Ford
PURCHASER   Peter E. Wynn

Please enter my order for one                          car as follows:

| Make | Model | Color | Type | Year |
|---|---|---|---|---|
| Boat & Mtr. | | | | 1958 |

| Engine No. | Serial No. | | To be delivered |
|---|---|---|---|
| AS IS | | Tax | |

|  | TOTAL CASH DELIVERED PRICE | 475 00 |
|---|---|---|

| Cr-ed-it-s | Deposit on order   (AD)   Woodie | 25 00 |
|---|---|---|
| | Used Car Allowance | x x x x |
| | Less: Bal. owing to— | |
| | Cash on delivery   Due 2/1/64 | 450 00 |

RECORD OF TRADE-IN
NONE

The front and back of this Order comprise the entire agreement affecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized. I hereby certify that no credit has been extended to me for the purchase of this car except as appears in writing on the face of this agreement.

I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature. I certify that I am 21 years of age, or older, and hereby acknowledge receipt of a copy of this order.

Wo 2–0092
Ce 1–7920

Buyer's signature  x        Peter E. Wynn
Address  x                  1817 Kenilworth Dr.
    This order is not valid unless signed and accepted
        by dealer
WOODIE                              Accepted by
Salesman
                                    _____
                                    Dealer's Signature

Plaintiff further testified that on the designated day he returned to take delivery of the boat; he was accompanied by a friend with a car equipped with the neces-

sary hitch. Staley then advised plaintiff that they could not deliver the boat because it was mortgaged; no mention of the "receipt" above quoted was made. Plaintiff said that he would leave his deposit with defendant and that when the matter was cleared up he would still like to have the boat. Plaintiff departed but almost immediately returned for the purpose of talking to Mr. McMahon, president of defendant; he was informed that the latter was out of town and he then talked with Mr. Worn, defendant's new car sales manager, who informed him that he thought the boat belonged to Mr. McMahon and was not for sale. Two days later plaintiff had a telephone conversation with Staley in which he inquired why he had gotten two different stories from the defendant. Staley responded that the boat was mortgaged and that plaintiff probably wouldn't get it. That ended the conversation.

Mr. O'Brien, who accompanied plaintiff, corroborated plaintiff's statement that Staley told plaintiff that he couldn't have the boat and that there was a mortgage on it, and that there was no other reason given for refusal to deliver.

Foregoing for the moment consideration of the question of Staley's authority, the initial question in this case is whether otherwise an oral contract for the sale of the boat existed before the "receipt" or "order" was executed. According to plaintiff's testimony Walton had definitely told him that "they" had a boat for sale and, after exhibition and inspection, priced it to him at $495; that price was reduced to $475 after plaintiff found some minor defects; on the next day plaintiff definitely told Walton and Staley that he would take the boat at the price of $475. At this point the necessary elements of offer and acceptance were present to bring a contract into existence if plaintiff's testimony is to be believed. Thereafter plaintiff paid $25 on the purchase price with a commitment to return the second day thereafter to pay the balance of the price, to take delivery and to tow the

boat away, all with the acquiescence of Staley. Plaintiff asked for a receipt for the $25 and in response to that request he was given the instrument in question, which if taken at face value would change the existent relationship of the parties, as testified to by plaintiff, into a mere offer by plaintiff to buy.

Walton testified that after the "receipt" or "order" was signed he told plaintiff that he would "submit the order to the house," that is, "to Al Staley," and that he put it on Staley's desk. At a later point, he spoke again of having "submitted the order." His testimony by-passes any reference to a three-party conference—himself, Staley and plaintiff—as previously testified to by plaintiff, antedating the issuance of the "receipt." Staley endeavored to confine his testimony concerning his knowledge of the whole transaction to the instrument placed on his desk by Walton; he testified that the "receipt" or "order" was in existence before he ever talked with plaintiff and that it came to him "originally" by Walton placing it on his desk. However upon cross-examination, although at first having no recollection of talking with plaintiff, upon further questioning he remembered that he discussed the sale of the boat with plaintiff, that the reason why plaintiff could not haul the boat away on the day the receipt was issued was the lack of a hitch, that the $475 deal was "all right for me" and that he told plaintiff that he was glad to get the boat out of the storage shed so that he could have room in the shed.

The conflict of the testimony of plaintiff on the one hand and that of Walton and Staley on the other is apparent. Plaintiff's testimony would have the whole agreement completed before the receipt was issued by virtue of an offer made to him by Walton which plaintiff accepted the following day with the full acquiescence of Staley; Staley's testimony would condense the whole matter into an unaccepted offer to buy. There was thus presented a problem of credibility. The trial judge found as a fact "That on January 30, 1964, defend-

ant acting through its agent, Albert Staley, agreed to sell and plaintiff agreed to buy the said boat, motor and trailer for the sum of $475; the same to be delivered to plaintiff on February 1, 1964."

■ Relying principally upon its contention that the evidence shows no completed agreement between the parties, defendant cites cases exemplifying the elementary proposition that for an offer to bloom into a contract the offer must be accepted. No quarrel can be had with that proposition. We are referred to situations where a prospective vendor devises an order form by whose terms an intending—and signing—purchaser is placed in the position of an offeror. Thus in Bronson v. Weber Implement Co., 135 Mo.App. 483, 116 S.W. 20, the intending buyer delivered signed order form reciting "The original of this order to be forwarded to Weber Implement Co., St. Louis, Mo., and is taken subject to its approval * * *. This order is taken and recommended for acceptance by Chas. W. Gray." Similarly in Williams v. Emerson-Brantingham Implement Co., Mo.App., 198 S.W. 425, the order stated: "Original of this order to be forwarded to Emerson-Brantingham Imp. Co., and is taken subject to its approval." In Twentieth Century M. Co. v. Excelsior Springs M. W. & B. Co., Mo. App., 171 S.W. 944, 946, the order read: "This agreement is not binding on the party of the first part [vendor] until approved by its own office at Milwaukee, Wis." Likewise the order in International Filter Co. v. Conroe Gin, Ice and Light Co., Tex.Com.App., 277 S.W. 631, recited that "This proposal is made in duplicate and becomes a contract when accepted by the purchaser and approved by an executive officer of the International Filter Company, at its office in Chicago."

■ It is plainly the privilege of a dealer, represented by salesmen, so to frame the order forms which it customarily uses as to make the existence of a contract dependent upon the doing of some act by the principal or at the principal's head office. Where the terms of the order are such as to postpone the coming into existence of a contract until the doing of such act, the intending purchaser is only an offeror who has created a power in the alleged vendor which the latter may exercise or not as he chooses. Defendant's exhibit A is clearly a form of this character, which it seems obvious, the defendant here generally uses in connection with the sales of automobiles. However the cases last cited are of no aid here, for the evidence in each showed that the intending purchaser stood in the position of an offeror, while here our initial question of fact is whether or not the offer was made from the side of the defendant, acting through Walton and ratified by sales manager Staley. If so, a contract existed anterior to the execution of the instrument in question. Additionally a major question here exists whether that instrument, delivered to plaintiff, was intended by the parties to embody anything more than a receipt for money paid. The latter question was answered by the trial judge in his finding that "Defendant's Exhibits A and B constitute a receipt and memorandum of sale, and was not intended by the parties to constitute an offer by plaintiff subject to acceptance by defendant." Hence both questions above posed were answered by the trial court favorably to plaintiff.

■ Upon the appeal from a judgment in a court-tried case it is the function of the appellate court to make its own findings of fact from a consideration of all the evidence in the case. However we are ever mindful of the command of Rule 73.01, V.A.M.R. that upon such a review "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Where there is a sharp conflict in the testimony adduced we take due note of the fact that the trial judge had the witnesses before him and had the advantage of observing their general de-

meanor and manner of testifying as well as their possible self-interest. Accordingly great deference is accorded his findings unless the evidence clearly indicates to us an erroneous conclusion on his part. Upon a consideration of the whole record we find ourselves in accord with the trial court's finding that an agreement of purchase and sale was entered into on January 30, 1964.

■ Among the trial court's findings was one "That Albert Staley had apparent authority to make said sale on behalf of defendant." Neither defendant's motions nor its brief make complaint directed specifically to that finding. Defendant's points are confined to the general proposition that no contract between the parties existed and that, because defendant had not accepted an offer by plaintiff. However since the corporate defendant can act only through agents, the existence of a contract binding on it depends upon the authority, actual or apparent, of the person purporting to act on its behalf. Therefore, inquiry must be made concerning the status of Staley.

■ The doctrine of apparent authority is one of wide-ranging application and embodies the general proposition that where a person has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first person the latter is thereby bound to the third person who relies on the appearance so created. In such case the appearance of power is the equivalent of expressly conferred power, insofar as third persons are concerned. Sometimes such appearance results from the first person's course of conduct in which he allows the second person to perform a series of acts in his name although he has not given the second person any authorization to act in the specific instance. Johnson v. Hurley, 115 Mo. 513, 22 S.W. 492. Sometimes it results from the appointment of the second person to a type of position which ordinarily involves the authority to perform a certain function although no such actual authority exists [1]. See Koewing v. Greene County B. & L. Assn., 327 Mo. 680, 38 S.W.2d 40. The rule cannot be stated in terms of specific fact situations for its application may be as varied as the activities of man. This Court has expressed the principle as "the general rule that the principal is bound by the acts of his agent when he has placed the agent in such a position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby led to believe and assume that the agent is possessed of certain authority and that they may deal with him in reliance on such assumption. No one can question the principle of law that such acts and contracts of an agent as are within the apparent scope of the authority conferred on him, although no express or direct authority to do such acts or to make such contracts has been conferred, are also binding upon the principal." Werner v. Welsh Co., Mo.App., 247 S.W.2d 311, 313; Wind v. Bank of Maplewood & Trust Co., Mo.App., 58 S.W.2d 332, 336. In the present situation one finds that the defendant took ownership of a boat as a trade-in on the purchase of an automobile, that it stored the boat in that portion of its premises where used automobiles, taken in trade, were stored and offered for sale. Thereafter a salesman, speaking on behalf of defendant, exhibited and offered to sell the boat to plaintiff. As salesmen of this

[1]. Restatement of the Law of Agency Second, Comment c to Section 49: *"Inferences from agent's position.* Acts are interpreted in the light of ordinary human experience. If a principal puts an agent into, or knowingly permits him to occupy, a position in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of reason to know otherwise. The content of such apparent authority is a matter to be determined from the facts."

type generally have no authority to make contracts on behalf of principals, we assume that the salesman here could not create in the plaintiff a power to bind the employer by the plaintiff's acceptance. However in the employment hierarchy the used car sales manager Staley was the superior of the salesman and the used car sales manager ratified the conduct of the salesman. Thereupon the plaintiff accepted the offer so made.

■■■■■ Thus there is presented a setting, established by defendant, within which a person having a managerial position is expected to function and does function. When one is designated as the used car sales manager, a person dealing with him as such could reasonably believe that he had the authority to conclude sales transactions. In this connection we note the comments a and d to Section 27 of the Restatement of the Law of Agency Second:

" * * * apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent * * *. Thus, a manager has apparent authority to do those things which managers in that business at that time and place customarily do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have."

Nor do we believe that the apparent authority of the sales manager is limited to transactions involving the sales of used automobiles. While the trade-in of a boat on the purchase of an automobile was of infrequent occurrence, we believe that under the circumstances of this case the boat could well be considered as falling into the same category as traded-in cars, insofar as apparent authority is concerned. The boat was admittedly a traded-in item and normally would be regarded as available for resale. It was as much a used, or second-hand, item as. a used car, with noticeable defects. It was stored in that part of defendant's premises where used cars were stored. The price range, from $495 to $800, fell well within the range of offering prices of used cars and gave no notice that it was not available for purchase. From all this, one dealing with a sales manager could reasonably infer that the power of the latter extended to the disposition of trade-ins other than automobiles.

■■■■ At this point we encounter a curious admixture of actual authority and apparent authority. The president of the defendant testified that both Walton and Staley would have authority to offer the boat for sale on January 30 if it were still an asset of the defendant. Upon redirect examination, in an effort to modify this admission, he testified:

"Q. * * * if Al Staley or Woody were—were clothed with the authority to offer for sale anything other than a used automobile or used truck, you would have to discuss the price with them first, wouldn't you? A. That's correct."

This testimony brings the situation to the borderline for application of the elementary rule that a third person dealing with an admitted agent is not bound by secret limitations upon the power of the agent of which the third person had no notice; perhaps it calls for direct application of that elementary rule. In any event the expressed limitation in no way aids the defendant's case.

■■■■ In this connection, note is taken of defendant's argument that "it is most important to an industry engaged in sales to determine if it in fact can fix certain conditions to an offer before it ripens into a contract." The privilege of a prospective vendor to fix such conditions has been well asserted in what is said above concerning

the vendor's devising of an order form which puts the intending purchaser in the position of an offeror.[2] However if the vendor is the offeror—and we find that to be the situation here—such conditions must be expressed in his offer. Defendant's argument continues: "If it [vendor] did not limit its own sales personnel to conditions it might very soon find its business in a financially impaired condition." And that brings us around again to the simple proposition that a third person dealing with an agent is not bound by secret limitations which the principal places on the agent's power. No matter how valid such limitations may be as between principal and agent they do not detract from the agent's apparent authority.

Defendant attacks the trial court's finding of fact that on January 30, 1964, defendant owned and held as part of its inventory the boat in question. Defendant maintains that the boat was owned individually by a third person, Mr. McMahon, president of defendant. Defendant's witnesses testified that the boat was taken into defendant's inventory as a trade-in on the purchase of an automobile. McMahon testified that he personally bought the boat in the fall of 1963, that he had the title and the registration and that he paid in "the neighborhood of $500" for the boat. When asked the location of the title document, he said: "I probably have it in my safe deposit box." There was no other evidence of a transfer of the boat from the defendant; no title document or certificate of registration was produced. McMahon had no recollection of the trade-in allowance. The trial judge by his finding plainly declined to accept this McMahon testimony at face value. Nor do we find that testimony to have such cogency as to require us to find differently from the trial judge.

Whether or not the defendant owned the boat on January 30, 1964, is immaterial. Defendant confuses a sale and a contract to sell. The former is a transfer of ownership, a conveyance of the property in goods; the ability of the purported vendor to transfer title depends either upon his own title or upon his representation, real or ostensible, of the real titleholder. But the capacity to enter into a contract to sell a particular chattel is in no way dependent upon the contracting (would-be) vendor having title. This is no place for the writing of a textbook upon sales of personalty. It is enough to note that, according to common-law principles, a contract to sell an identifiable chattel entered into by the owner directly or through an agent, real or apparent, of the owner, operates to convey instantly the title of owner-vendor to the purchaser unless the contract or a statute specifically provides otherwise. If the contracting (would-be) vendor has no title, he is nevertheless bound by his contract to sell—to procure the title and to transfer it to his contracting vendee or to otherwise procure a transfer of the title to that vendee. Consequently in this action for damages it is immaterial whether or not defendant had the title to the boat at the time the parties entered into the contract.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.

2. And, of course, the offeror as buyer may, in his offer, express such limitations on the power of anyone else to act for him as he chooses. Werner v. Welsh Co., supra.