HAMILTON HAULING, INC.,
Appellant,

v.

GAF CORPORATION, Respondent,

and

John A. Bajt, Defendant.

No. WD 37187.

Missouri Court of Appeals,
Western District.

Sept. 16, 1986.

Application to Transfer Denied
Dec. 16, 1986.

Weldon W. Perry, Jr., Perry & Rust, Lexington, for appellant.

William L. Turner, Sarah W. Hays, Gage & Tucker, Kansas City, for respondent.

Before SHANGLER, J., Presiding, and DIXON and LOWENSTEIN, JJ.

DIXON, Judge.

Plaintiff Hamilton Hauling, Inc., appeals from a jury verdict for defendant GAF Corporation in a contract action. The only claims of error relate to instructions. Fundamental to the instruction issue is whether John Bajt, an agent of GAF, had the authority to execute a contract on behalf of GAF. The contract in question required GAF, a manufacturer, to purchase a minimum of over $800,000 of raw materials annually from Hamilton Hauling for a period of ten years.

Bajt was a purchasing agent or buyer at GAF's Kansas City plant from 1973 until 1980. Prior to that Bajt worked as an assistant purchasing agent at GAF's Joliet, Illinois plant. Duties of a purchasing agent generally included the acquisition and purchase of all raw materials and related supplies necessary to sustain plant production on a day-to-day basis.

In that capacity, Bajt conducted all negotiations and sales transactions with various vendors for the purchase of raw materials, particularly wood chips, for the Kansas City plant. In the last year of his employment, Bajt purchased approximately $6,000,000 worth of raw materials to be used in production at the plant. None of these purchases were by any document other than a purchase order pursuant to Bajt's actual authority.

The evidence showed that under GAF's internal policy, buyers at Bajt's level had authority to make purchase orders not exceeding $25,000 in amount or one year in duration. Any order or contract exceeding those limits had to be approved in advance by GAF's corporate headquarters. All purchase orders were eventually sent to corporate headquarters for review. Bajt acknowledged the $25,000 limit on the purchase of items for maintenance, repair and operations but denied that it applied to the acquisition of raw materials. No evidence was presented to show that buyers like Bajt customarily entered into long term contracts or contracts involving amounts over $25,000. In all his years with GAF, Bajt never entered into any long term contract except the one at issue in this case.

Hamilton Hauling, solely owned by Warren Hamilton, had supplied a variety of goods and services to GAF and its corporate predecessors at the plant since 1954. During his course of business with GAF, Hamilton had dealt with three different purchasing agents. Hamilton had never had a long term contract with GAF but dealt with it consistently on a purchase order basis. A purchase order could be cancelled by GAF at any time. Hamilton was aware that GAF had at one time entered into a contract with another wood chip vendor prior to the time the agreement here was executed. Bajt was also aware of that contract and knew that it had been signed at corporate headquarters.

A continuous, uninterrupted supply of wood chips was essential to meet the production demands of the plant. The harsh winter of 1978/1979 adversely affected GAF's ability to obtain an adequate supply of wood chips. Bajt negotiated with Hamilton for several months encouraging him to go into the wood chip business so that Bajt might obtain a dependable supplier of wood chips. Hamilton was wary about supplying wood chips to GAF on a purchase order basis because he previously had been cancelled twice by GAF on orders involving delivery of raw materials. Preparation by Hamilton to supply GAF with the needed wood chips would be costly, and Bajt was aware of that. On February 1, 1979, Bajt and Hamilton entered into a contract to purchase which required GAF to purchase approximately 26,000 tons of wood chips annually from Hamilton and his two associates at a minimum cost of more than $800,000 per year for 10 years. The agreement was drawn up by Hamilton's attorney and signed by Bajt in Hamilton's office. Bajt left the original agreement with Hamilton. The agreement was subject to renegotiation of price increases at six-month intervals.

Bajt admitted that he never sent a copy of the contract to GAF's corporate headquarters. No one at GAF seemed to know about the agreement other than Bajt's secretary. Hamilton acknowledged that he never told his two associates in the wood chip business that he had a contract with GAF; in fact, he indicated to them that he only had a purchase order.

After the execution of the agreement, Bajt continued to issue standard purchase orders for all wood sold to GAF by Hamilton, and the purchase orders were routinely sent to GAF's corporate headquarters. The wood supplied by Hamilton pursuant to the purchase orders issued after the signing of the agreement was inconsistent

with the tonnage requirements specified in the agreement. Bajt was terminated by GAF in September 1980 and in December 1980, GAF notified Hamilton Hauling that no further deliveries of wood chips would be accepted. Hamilton produced the contract. GAF disclaimed any knowledge of the contract and denied the authority of Bajt to have made such a contract on its behalf.

At trial Hamilton testified that Bajt had told him that he had authority to execute the contract and Hamilton believed him. There was substantial evidence, however, that Hamilton was aware of limitations on Bajt's authority to contract. Both of Hamilton's associates in the wood chip business testified that they had informed Hamilton of conversations with Bajt in which Bajt had indicated his limited authority to contract. These conversations took place prior to the execution of the agreement between Hamilton and Bajt.

Hamilton acknowledged that he had entered into contracts with two other corporations and in each instance the contract had been prepared and executed at the corporate headquarters of the respective company rather than by the local plant manager. It was Hamilton Hauling's theory throughout the trial that Bajt bound GAF because he acted with apparent authority.

On appeal, Hamilton Hauling complains that the instruction given by the trial court defining apparent authority was erroneous. GAF's initial response is that since the instruction was "offered" by Hamilton Hauling, Hamilton Hauling may not now complain of error because the instruction was given. During the instruction conference Hamilton Hauling tendered a definition of apparent authority in Instruction A, which was refused. The court then indicated it would give GAF's apparent authority instruction, offered to the court as Instruction B. Under that compulsion Hamilton Hauling modified GAF's instruction and "offered" it to the trial judge. That was the definition of apparent authority given by the trial court in Instruction 9. During the instruction conference counsel for Hamilton Hauling made a record that the modified Instruction B was offered only because the trial court had refused Instruction A.

In support of its argument that Hamilton Hauling waived any error in the instructions, GAF cites cases which stand for the general proposition that a party may not complain of an instruction that it offered. This doctrine, which is an application of the general principle of "invited error," is well established. In *Arnel v. Roettgen*, 530 S.W.2d 20, 22 (Mo.App.1975), the court said:

> The doctrine of "invited error" on which defendant relies in this case may apply in proper cases to instructions. A good statement of how the rule should be so applied appears in *Morris v. Klein*, 400 S.W.2d 461, 465 (Mo.App.1966), where it is stated that "a party may not predicate error on a theory of law he himself has adopted." The doctrine therefore prevents a party from attacking an instruction which he himself selected or devised under which to submit to the jury his theory of substantive law on which he asks the case to be decided. Thus, a party has frequently been barred from complaining of his own verdict-directing instruction.

While the instruction challenged in the instant case is not a verdict directing instruction, it is a definitional instruction critical to the theory of the verdict-directing instruction.

The issue is not to be resolved simplistically by who "offered" the instruction; the circumstances of the "offer" must also be considered. Instruction A was Hamilton Hauling's theory of the law of apparent agency to be applied in this case. Instruction B embodied the theory GAF was espousing. When the court indicated it was going to give Instruction B, it had in effect taken the instruction "offered" by GAF. The modification of Instruction B by Hamilton Hauling was not substantive on the issue the instruction presented. The modification was not such a change in substance that the instruction was "adopted,"

"selected," or "devised" by Hamilton Hauling. The claim of error is not waived in this case.

■ GAF also argues that:

In order to claim prejudice from a jury instruction Missouri now requires specific objections at the time of the instruction conference. *James Lee v. Mitchell Mirbaha*, No. 49262 (January 21, 1986); *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984); *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984). Compliance in the motion for a new trial with Rule 70.03 of the Missouri Rules of Civil Procedure no longer automatically preserves instructional error for appeal. *James Lee v. Mitchell Mirbaha*, No. 49262 (January 21, 1986). Appellant made no specific objection to its proposed instruction 9 at the time of the instruction conference.

GAF contends that Hamilton Hauling may not complain about the instruction to which "no objections" were made. To the extent GAF's argument is based upon *Lee v. Mirbaha*, No. 49262 (Mo.App.E.D. Jan. 21, 1986), it is without authority since the *Lee v. Mirbaha* case was transferred to the Supreme Court of Missouri in April 1986. There is language in *Fowler v. Park Corp.*, 673 S.W.2d 749, 756 (Mo. banc 1984), and in *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984), which might be read as broadly as GAF has done in the argument set forth above. Nonetheless, Rule 70.03 has not been repealed or amended and when instructional error is asserted in a motion for new trial, it is preserved. What *Fowler v. Park Corp.* and *Hudson v. Carr* seem to establish is a rule that unless an objection is made at the time of the instruction conference, the failure to so object may be considered on the issue of prejudice. *Hudson*, 668 S.W.2d at 71–72; *Fowler*, 673 S.W.2d at 756, 757. This is further confirmed in the recent case, *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682 (Mo. banc July 15, 1986). In *Cornell* dual affirmative defense comparative fault instructions, not objected

to at the instruction conference, were found not to be confusing and misleading to the jury when the defect "[was] not readily apparent to counsel preparing to argue the case." *Cornell*, 712 S.W.2d at 682. In the context of the instant appeal, the disposition of the claim of error on substantive grounds makes it unnecessary to consider the issue of prejudice.

Hamilton Hauling asserts that a new trial should be granted for error in two instructions. The first instruction challenged reads as follows:

### INSTRUCTION NO. 9

Acts are within an employee's apparent authority as that term is used in the verdict director even though not specifically authorized if:

1. The defendant GAF Corporation knowingly permitted its employees to so act, and

2. Hamilton Hauling, Inc. knew that GAF Corporation knowingly permitted its employees to so act, and

3. Hamilton Hauling, Inc., acting reasonably and in good faith, actually believed that GAF employees had the authority to so act, and

4. Hamilton Hauling, Inc. relied on the authority of GAF Corporation's employees, and

5. Hamilton Hauling, Inc. will be damaged if said acts of GAF Corporation's employees are not binding on GAF Corporation.

Hamilton Hauling urges the instruction is erroneous because of the requirement that the jury find that Hamilton Hauling *knew* that GAF had knowingly permitted Bajt to contract. Hamilton Hauling says that this requirement is contrary to law and that its Instruction A which had no such requirement should have been given. The tenor of the Hamilton Hauling argument is that Bajt's apparent authority arose from his position as a buyer and his actions in that position. GAF contends that given the specific limitations on Bajt's authority there must be proof that GAF

had acquiesced in Bajt's overstepping of his authority. GAF also contends the acquiescence must be known to Hamilton Hauling. The nub of the issue as to the instructional error turns on the positions of the parties as to the definition of apparent authority to be applied in the case.

Some review of the principles governing apparent agency will aid in the consideration of the issue. In the area of agency, Missouri courts have relied extensively on the RESTATEMENT (SECOND) OF AGENCY (1957); F. MECHEM, A TREATISE ON THE LAW OF AGENCY (2d ed. 1914); and 3 AM.JUR.2d *Agency* (1986).

■ It is generally held that when a principal "holds out" another as possessing certain authority, thereby inducing others reasonably to believe that authority exists, the agent has apparent authority to act even though as between himself and the principal, such authority has not been granted. *See Rusk Farms, Inc. v. Ralston Purina Co.,* 689 S.W.2d 671, 678 (Mo.App. 1985). Apparent authority differs from actual authority in that the principal communicates directly with a third person to create apparent authority; to create actual authority, the principal communicates directly with the agent. RESTATEMENT (SECOND) OF AGENCY § 8 comments a and e (1957). *Dudley v. Dumont,* 526 S.W.2d 839, 845 (Mo.App.1975).

■ When a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act on behalf of his principal, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform the act. *Koewing v. Greene County Building & Loan Association,* 327 Mo. 680, 688, 38 S.W.2d 40, 43 (1931); *State ex rel. Massman v. Bland,* 355 Mo. 17, 24, 194 S.W.2d 42, 46 (banc 1946); *Erickson v. Civic Plaza National Bank,* 422 S.W.2d 373, 380 (Mo.App.1967); *Dudley,* 526 S.W.2d at 845.

■ The "holding out" of the agent's authority by the principal party may be by action or inaction. The principal may directly communicate the authority to a third party or knowingly permit the agent to exercise such authority. *See Continental-St. Louis Corp. v. Ray Scharf Vending Co.,* 400 S.W.2d 467, 470 (Mo.App.1966). The *Continental-St. Louis Corp.* court quotes 3 AM.JUR.2d *Agency* § 74 (now § 79) as saying:

> [T]he rule is that if a principal acts or conducts his business, either intentionally or through negligence, or fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, such principal is bound by the acts of the agent within the scope of his apparent authority as to any person who, upon the faith of such holding out, believes, and has reasonable ground to believe, that the agent has such authority, and in good faith deals with him.

*Id.*

■ It must be emphasized that the third party must reasonably rely on the authority held out by the principal. The third party must know of facts demonstrating the principal's consent to the agent's actions. *Id.* "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." RESTATEMENT (SECOND) OF AGENCY § 8 comment c. Further, the third party must actually believe the agent to be authorized. *Id.* Apparent authority is that which a reasonably prudent man, using diligence and discretion, in view of the principal's conduct would suppose the agent to possess. *State ex rel. Massman,* 355 Mo. at 24, 194 S.W.2d at 46; *Wyler Watch Agency, Inc. v. Hooker,* 280 S.W.2d 849, 854 (Mo.App.1955).

> [T]he party who claims reliance [on an agent's apparent authority] must not have closed his eyes to warning or inconsistent circumstances. Authority is not

'apparent' simply because the party claiming has acted upon his conclusions * * * [nor] simply because it looked so to him. It is not a situation where one may read while he runs. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions * * * brought to his notice, would reasonably rely, that a case is presented within the operation of the rule. Mechem on Agency (2nd Ed.), Vol. 1, Sec. 726, p. 513.

*Wyler Watch Agency,* 280 S.W.2d at 854; *Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5, 13 (Mo.1970).

■ Where the agent has some present actual authority, apparent authority may arise in any of three ways. The basic requirement for the creation of apparent authority is that it is the principal who is responsible for the information received by the third party. RESTATEMENT (SECOND) OF AGENCY § 27 comment a. The principal must have intentionally caused the third party to believe that the agent is authorized to act for the principal or he should have realized his conduct would create such a belief on the part of the third party. *Id.*

> The information received by the third person may come directly from the principal by letter or word of mouth, from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communication. Likewise, as in the case of authority, apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent. So, too, a

person who permits another to do an act in such a way as to establish in a community a reputation of having authority to act, either by directing the agent so to represent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation. Third persons who are aware of what a continuously employed agent has done are normally entitled to believe that he will continue to have such authority for at least a limited period in the future, and this apparent authority continues until the third person has been notified or learns facts which should lead him to believe that the agent is no longer authorized.

*Id.*

Establishment of apparent authority by direct, express statements is obvious. The other methods of creating apparent authority—by "position" and by "prior acts" have both been recognized by Missouri courts.

*Wynn v. McMahon Ford Co.,* 414 S.W.2d 330 (Mo.App.1967), exemplifies the apparent authority that may be generated by an agent's position. In *Wynn,* defendant's agent designated as used car sales manager, was placed by defendant in a managerial position. *Id.* at 337. The court found that persons dealing with the agent could reasonably believe that he had authority to conclude sales transactions. *Id.* According to the RESTATEMENT (SECOND) OF AGENCY § 49 comment c, "[i]f a principal puts an agent into, or knowingly permits him to occupy, a position in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of reason to know otherwise." *Fielder v. Production Credit Association,* 429 S.W.2d 307, 313 (Mo.App. 1968); *See Trail v. Industrial Commission,* 540 S.W.2d 179, 181 (Mo.App.1976);

*Rusk Farms, Inc.*, 689 S.W.2d at 678; *Dudley*, 526 S.W.2d at 845.

■ Another way apparent authority may be created is by acquiescence of the principal in prior acts of an agent.

> [W]herever a person ... has knowingly and without dissent permitted ... [an]other to act as his agent in such capacity, or where his habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent, authorized to act in that capacity, whether it be a single transaction or a series of transactions, his authority to act for him in that capacity will be conclusively presumed so far as it may be necessary to protect the rights of third persons who have relied thereon in good faith and in the exercise of reasonable prudence; and he will not be permitted to deny that such other was his agent, authorized to do the act he assumed to do, provided that such act is within the real or apparent scope of the presumed authority.

*Bennett v. Potashnick*, 214 Mo.App. 507, 514, 257 S.W. 836, 838 (1924); *Jefferson-Gravois Bank v. Cunningham*, 674 S.W.2d 561, 563–564 (Mo.App.1984). Apparent authority may result from a prior relation of agent and principal. *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 13. The principal by allowing an agent to carry out prior similar transactions may create an appearance of authority of the agent to carry out such acts. *See Trail*, 540 S.W.2d at 181; *Jefferson-Gravois Bank*, 674 S.W.2d at 563. As it is expressed by the RESTATEMENT, "a person who permits another to do an act in such a way as to establish in a community a reputation for having authority to act, ... creates apparent authority with respect to those who learn of the reputation." RESTATEMENT (SECOND) OF AGENCY § 27 comment a.

■ To restate the parties' positions, Hamilton Hauling argues that since Bajt was a *purchasing agent*, the authority to contract upon behalf of GAF is inferable from the position he held. Hamilton Hauling offered Instruction A, which was re-fused by the court, to submit on that theory. GAF has contended that in order for apparent authority to arise the principal must *know* of the acts of the agent outside of his actual authority and acquiesce and the third party must know of the acquiescence before an apparent authority is created. Instruction 9 set forth above embodies this view of the law.

From the review of the law of apparent authority set out above, it is clear that both parties' abstract statements of the applicable law of apparent authority are basically correct if the necessary factual matrix is present in the case to support the statements. There is the rub in this case; neither party offered an instruction which is supported by the evidence. There is no evidence to support either theory of the law espoused by the parties.

There was no evidence to show that GAF knowingly permitted Bajt to enter into the contract in question. Bajt had never entered into a long term contract before. Bajt admitted he did not send a copy of the contract to corporate headquarters and no one at GAF seemed to know about the contract. Clearly, the contract was made in violation of internal corporate policy and nothing was presented to show that GAF generally "ignored" its policy in making long-term multi-million dollar contracts. Instruction 9 required a finding that GAF had knowledge of Bajt's exceeding his authority. It further required a finding that Hamilton Hauling knew of GAF's knowledge. There is no evidence to support either finding.

However, the trial court error in giving Instruction 9 to the jury without evidentiary support is immaterial because Hamilton Hauling's theory of apparent authority was not supported by the evidence either.

Apparent authority could only have resulted from some act or failure to act on the part of GAF. Hamilton testified that Bajt told him he had the authority to contract and Hamilton believed Bajt. Bajt's unauthorized representations are totally immaterial on the issue of apparent authority.

Hamilton Hauling claims Bajt's authority came from his position, however, there was no evidence of any sort in this case as to the *usual* authority of purchasing agents generally. There was nothing to support an inference that a vendor dealing with a purchasing agent expects that agent to have the power to make a contract like the long term agreement in evidence. There was evidence that Bajt had twice exceeded the company-imposed limits on his authority in making *purchase orders*. No purchase order represented a long-term contract and all purchase orders contained explicit limitations on the purchase including the right to cancel. There was no evidence that Bajt had ever entered into a long term contract on behalf of GAF; in fact, Bajt admitted that in all his years at GAF, he had not made any other such contract. Bajt was not clothed with apparent authority by virtue of his position. Moreover, there was no evidence to support Hamilton's claim that he reasonably relied on Bajt's authority. Hamilton admitted that the contracts he had entered into with other corporations were signed at corporate headquarters, not locally. Apparent authority is not a "situation" where one can "read while he runs."

Since neither party adduced evidence to support its theory of the case, the trial court error in giving Instruction 9 is immaterial. There was no submissible case.

The above conclusion renders Hamilton Hauling's second point of instructional error moot.

The judgment favoring GAF is affirmed.

All concur.